UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| BRANDON LATIMER | CIVIL ACTION NO. CV- |
| VERSUS | JUDGE |
| | |
| DEWAYNE JACKSON, EARL PEARCE, BRADLEY MARR, and JASON "JAKE" RIVERS | MAGISTRATE JUDGE |
| | JURY TRIAL DEMANDED |

**PLAINTIFF'S ORIGINAL COMPLAINT
FOR VIOLATIONS OF 42 U.S.C. § 1983 AND
<u>LOUISIANA STATE LAW CLAIMS</u>**

NOW INTO COURT, through undersigned counsel, comes plaintiff, BRANDON LATIMER, who files this his Original Complaint, and would respectfully show the Court as follows:

<u>**JURISDICTION**</u>

1.

This is an action for violation of 42 U.S.C. § 1983.  Plaintiff seeks actual and compensatory damages, punitive damages, attorneys' fees, and costs.  Jurisdiction is based on federal question jurisdiction, 28 U.S.C. §1331.

2.

Jurisdiction for plaintiff's Louisiana state law claims is based on 28 U.S.C. §1367.

## PARTIES

3.

Plaintiff, BRANDON LATIMER ("Mr. Latimer"), is a person of the full age of majority domiciled in Sabine Parish, Louisiana.

4.

Defendants DEWAYNE JACKSON, EARL PEARCE and BRADLEY MARR are persons of the full age of majority residing in Sabine Parish, Louisiana and are deputy sheriffs for the Sabine Parish Sheriff's Office.

Defendant JASON "JAKE" RIVERS is a former Sabine Parish sheriff's deputy, whose spouse works as the secretary to the Sheriff of Sabine Parish.   He is a resident of Sabine Parish.

## FACTUAL ALLEGATIONS

5.

This case arises from the June 5, 2019 wrongful arrest of Brandon Latimer for criminal defamation.  Mr. Latimer's alleged criminally defamatory statement was directed against defendant Jason "Jake" Rivers, a former Sabine Parish Sheriff's Office investigator.

6.

Mr. Latimer and defendant Rivers had a prior history of disagreement with one another.  Mr. Latimer had been highly critical of defendant Rivers' handling of criminal investigations relating to Mr. Latimer's daughter.

7.

In 2011, Brandon Latimer filed a criminal complaint of child abuse involving Mr. Latimer's daughter.   The complaint involved Andrea Sepulvado Maxey, the mother of his daughter; Justin Maxey, Andrea's husband; and Fred Sepulvado, Andrea's brother.   Specifically, Mr. Latimer complained that Fred Sepulvado and Justin Maxey had duct-taped Mr. Latimer's toddler daughter to a chair (with Andrea Sepulvado present).   The Maxeys and Fred Sepulvado had placed duct tape on the child's legs, arms and over the eyes.   Mr. Latimer filed a complaint against the Maxeys with the Sabine Parish Sheriff's Office ("SPSO").   The complaint was investigated by defendant Rivers, who was then employed by the SPSO as an investigator.    Defendant Rivers did not like Mr. Latimer, and did not do anything meaningful to further the investigation.   Defendant Rivers would tell Mr. Latimer that he was "taking the investigation materials to the District Attorney's office," but that apparently never happened.

8.

Because the case against the Maxeys and Sepulvado was not fully investigated, Mr. Latimer filed a complaint against defendant Rivers with the Federal Bureau of Investigation.    Defendant

Rivers was aware of the complaint shortly after it was filed.   Among other things, defendant Rivers complained to one of Mr. Latimer's relatives about the fact that Mr. Latimer and his mother Hazel Dyess had reported him to the FBI.

9.

Shortly after Mr. Latimer reported the child abuse to the SPSO, Justin Maxey became aware of Mr. Latimer's child abuse accusations.   Justin Maxey confronted Mr. Latimer at a child custody exchange.   Maxey blocked in Brandon Latimer and Hazel Dyess.   Maxey threatened Mr. Latimer and cussed out both Mr. Latimer and his mother Hazel Dyess.     Mr. Latimer and his mother went to the SPSO to file charges against Maxey.   The case was assigned to defendant Rivers.   Again, defendant Rivers seems uninterested in moving a case forward that involved Mr. Latimer has a complainant.   Mr. Latimer and his mother had to constantly cajole defendant Rivers into moving the case forward.  It was clear to Mr. Latimer that defendant Rivers again did not want to do anything to prosecute someone against whom Mr. Latimer filed a complaint.

10.

Ultimately a charge of simple assault was filed and Maxey pleaded guilty to a reduced charge of disturbing the peace by loud and profane language on December 14, 2011.

11.

Between 2012 and 2019, Mr. Latimer had an continuing dispute with his child's mother Andrea Sepulvado Maxey     The dispute primarily related to Andrea Maxey's failure to comply with various court orders.

12.

On May 23, 2019, there was a court proceeding in Sabine Parish involving Mr. Latimer and his daughter's mother, Andrea Sepulvado Maxey (now Andrea Sepulvado Downs).    While Mr. Latimer was at the courthouse, he became frustrated that the mother's continuing misconduct involving Mr. Latimer's daughter had never been properly investigated nor properly presented to the Court.  This misconduct included the 2011 child abuse allegation that led to Mr. Latimer's complaint against defendant Rivers.

13.

On the evening of May 23, 2019, Brandon Latimer posted a video on Facebook that was, among other things, critical of former Sabine Parish Sheriff's Office deputy Jason "Jake" Rivers. During the video, Mr. Latimer stated that it had been reported to him that defendant Rivers had been fired for taking a payoff.

14.

On June 1, 2019, Rivers received a call from friends who informed him about the video posted on Facebook by Brandon Latimer.

15.

Jason "Jake" Rivers then contacted his cronies at the Sabine Parish Sheriff's Office ("SPSO") to have charges filed against Brandon Latimer.    As a former employee of the SPSO (whose wife was the Sheriff's secretary), Rivers had easy access to employees of the SPSO.   The case was initially assigned to Sabine Parish Sheriff's Deputy Brad Walker (who, on information and belief, had little active involvement in the Latimer case).    From the SPSO arrest records, it appears that defendant Rivers talked to investigators Bradley Marr and Steven Bradley about Rivers' "complaint."   However, defendant Marr was the investigator who worked with defendant Rivers to get Mr. Latimer arrested.    Rivers filled out a "voluntary statement" which stated that Brandon Latimer had "slandered (his) name."    The report indicates that Mr. Rivers was directed to seek a warrant from one of the Sabine Parish justices of the peace.    This is a tactic used by law enforcement when they know that a legally trained judge would almost certainly deny the issuance of the warrant. *See Exhibit "1."*

16.

On June 4, 2019, Jason "Jake" Rivers, with the assistance and input of Bradley Marr,  filled out an arrest warrant for the Louisiana crime of defamation.    On June 5, 2019, Rivers and/or Bradley Marr presented the arrest warrant to a local Justice of the Peace in Sabine Parish.  This warrant was not prepared by the Justice of the Peace –  it was prepared by Jason "Jake" Rivers and was presented to the Justice of the Peace for signature.

– 6 –

17.

There is also a question as to whether the warrant was actually obtained prior to Mr. Latimer's arrest.    The arresting deputies told Mr. Latimer that Justice of the Peace Mattie Sepulvado had signed the warrant.   In fact, she had not.  The arresting deputies could not locate a copy of the warrant and represented to Mr. Latimer that they did not have a copy of the warrant with them.

18.

On June 5, 2019, Brandon Latimer was arrested by SPSO deputies Dewayne Jackson and Earl Pearce on the warrant for criminal defamation.    This arrest was made at the behest of Jason "Jake" Rivers and Bradley Marr.   The Louisiana defamation statute was, at the time of the arrest, unconstitutional and the Louisiana legislature had identified it as an unconstitutional criminal statute.

19.

When Mr. Latimer was arrested, Mr. Latimer was informed by the arresting deputies that there was a warrant for his arrest.   But, the arresting deputies were unable to produce a copy when Mr. Latimer asked for one.   The arresting deputies told Mr. Latimer that the warrant was "at the detention center."  They did indicate that Mr. Latimer "was being arrested because Jake did not get fired."   They also indicated that the warrant was signed by Sabine Parish Justice of the Peace Mattie Sepulvado.    In fact, Justice of the Peace Sepulvado had not signed any warrant for the arrest of Brandon Latimer.

20.

At the detention center, Mr. Latimer again requested a copy of the warrant.  This request was based upon the statements made by the arresting deputies that the "warrant was at the detention center."  However, Mr. Latimer was told at the detention center that "the warrant was at the detective's office."

21.

Mr. Latimer was suspicious about his inability to obtain a copy of the warrant on the date of his arrest.   As a result, Hazel Dyess, who is Mr. Latimer's mother, called Justice of the Peace Sepulvado to inquire about the warrant.    Justice of the Peace Sepulvado stated that she knew nothing about the warrant and that she had not signed any warrant to arrest Mr. Latimer.  Justice of the Peace Sepulvado told Hazel Dyess that "if she found Ms. Sepulvado's name on a warrant, to let her know."

22.

Following the contact with Justice of the Peace Sepulvado, Brandon Latimer and his family members made repeated requests for a copy of the arrest warrant.   They were repeatedly told that it "could not be found" and/or that it was in another location (but when that location was checked, the warrant was not at that location).     Hazel Dyess went to the Sabine Parish Sheriff's Office. She was told that they did not know where the warrant was.   Ms. Dyess then went to the Sabine Parish District Attorney's Office and was told that "it wasn't there."

23.

The quest for the alleged warrant continued, with neither Mr. Latimer nor his mother having any success finding out who had a copy of the arrest warrant and what magistrate signed the arrest warrant.   In fact, both Mr. Latimer and his mother were convinced that no arrest warrant existed (as it should have been an easy document to locate).

24.

No one in Sabine Parish was ever able to produce a copy of the warrant to Mr. Latimer (in spite of numerous requests directed to numerous different agencies).  It was finally produced (with significant redactions) by the Louisiana Attorney General's office in July, 2019.  *See Exhibit 1.*

25.

When Mr. Latimer finally received a copy of the warrant, the warrant was not signed by Justice of the Peace Sepulvado.  It was instead signed by Justice of the Peace Mike Tarver.   Once the warrant was produced, Mr. Latimer and his mother Hazel Dyess went to see Justice of the Peace Tarver.   Mr. Tarver reviewed Mr. Latimer's copy of the alleged warrant and commenced to have a conversation with Mr. Latimer and Hazel Dyess on how Justice of the Peace ("JP") warrants are handled in Sabine Parish.    JP Tarver noted that the Sheriff's Office investigators would normally give someone a "JP Packet" when the investigators did not want "to fool with" the complaint. However, when a member of the public would present a "JP Packet" to JP Tarver, he would refer

them back to the Sheriff's Office as he did not want to issue a warrant in a matter that had not been investigated.

26.

In the present case, there was no "JP Packet".   This warrant was presented to JP Tarver to avoid any meaningful review by a magistrate.   Any lawyer would have immediately recognized that a criminal defamation case in Louisiana is an unconstitutional proceeding.   Had that warrant been presented to the District Judge in Sabine Parish, in undoubtedly would have been rejected.

27.

If the warrant was signed before Mr. Latimer's June 5, 2019 arrest, it was clear that the arrest warrant was the product of defendants Marr and Rivers.   Based upon the conversations of Mr. Latimer and/or his mother with Justice of the Peace Tarver, facts concerning the warrant were either misrepresented or withheld from Mr. Tarver.    Clearly, defendants Marr and Rivers did not want to present this specious warrant based upon an unconstitutional statute to a district judge.  Likewise, they did not want to present any facts to the lay judge who ultimately signed a warrant.

28.

Since 2016, it has been well known that the Louisiana criminal statute for defamation was an unconstitutional farce.  The statute, La. R.S. 14:47 et seq., was listed as an unconstitutional statute in the Unconstitutional Statutes Biennial Report to the Legislature, dated March 14, 2016.     The statute is clearly unconstitutional on its face.   Among numerous constitutional flaws, truth is not an

absolute defense.   For example, under the wording of the statute a person could be arrested for the

crime of defamation for making a true statement.    The deputies involved in Mr. Latimer's arrest

clearly knew or should have known that the statute was unconstitutional.   Defendants Marr and

Rivers were motivated by their animosity and malice towards Mr. Latimer.  They were "going after"

Mr. Latimer because of his prior complaints against defendant Rivers.  This was, in short, an

opportunity for retribution.    The arrest was also made with the intent to discourage Brandon

Latimer from making any further statements of public concern on Facebook or any other social

media platform.   In fact, the Sheriff of Sabine Parish told Mr. Latimer's mother and Mr. Latimer's

step-father that "they needed to stay off Facebook."

29.

Mr. Latimer's arrest was without any probable cause whatsoever.   The arrest was clearly

unconstitutional.    The arrest was likewise made in bad faith.

30.

The "defamation" criminal case against Brandon Latimer was referred to the Louisiana

Attorney General for prosecution.    The Louisiana A.G.'s office clearly recognized that it was a

frivolous, meritless and unconstitutional prosecution, thus, no complaint was ever filed.     No

reasonable law enforcement would believe that any prosecutor would file any formal charge against

Mr. Latimer.   The sole purpose of the arrest was to embarrass Mr. Latimer and to try to pressure him

into not commenting on Sabine Parish political issues.

31.

As a result of defendants' deprivation of Mr. Latimer's constitutional rights, Mr. Latimer was subjected to public ridicule and embarrassment.   In a small, rural parish such as Sabine Parish, word "got around" very quickly about Mr. Latimer's arrest.   Initially, the Sheriff's Office place Mr. Latimer's arrest on their Facebook page.   After Mr. Latimer's mother started making inquiries, the Sheriff's Office removed the Facebook page.

32.

As a result of defendants' deprivation of Mr. Latimer's constitutional rights, Mr. Latimer was forced to undergo a criminal prosecution, which caused financial and emotional hardship to Mr. Latimer.

33.

Defendants have caused special and general damages to Mr. Latimer, for which he is entitled to reasonable recovery.

34.

Petitioner's damages include, but are not limited to:

(A)     Attorneys' fees incurred in defending the criminal case against him;

(B)     Extreme mental anguish (past, present, and future);

(C)     Loss of enjoyment of life; and

(D)     All such other damages as may be proved at trial.

## CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1983

35.

Defendants, acting in their individual capacities under color of law, have subjected Mr. Latimer to the deprivation of rights, privileges, or immunities secured by the Constitution and laws.

36.

Specifically, defendants have intentionally violated Mr. Latimer's rights under the Fourth Amendment to the United States Constitution by depriving him of his right to be free from unconstitutional seizure and/or arrest.   Defendants have also intentionally violated Mr. Latimer's rights under the First Amendment to speak out on matters of public concern and to be free from a retaliatory criminal prosecution when he exercises those First Amendment rights.

37.

Defendants Marr and Rivers further intended to use Mr. Latimer's arrest as a vehicle for suppressing any further similar statements of public interest by Mr. Latimer or other members of the public.

38.

As a result of the actions of intentional deprivation of or deliberate indifference to Mr. Latimer's First and Fourth Amendment rights, he has sustained actual and compensatory damages, and is entitled to recover costs, pre- and post-judgment interest, and attorneys' fees.  Plaintiff is also entitled to punitive damages.

## CAUSE OF ACTION: STATE LAW FALSE ARREST

39.

Defendants actions in arresting Mr. Latimer without probable cause and pursuant to an unconstitutional statute constitutes the tort of false arrest under Louisiana Civil Code Article 2315.

40.

Petitioner specifically alleges that defendants Rivers and Marr acted with malice in effectuating the wrongful arrest, or, alternatively, defendants Rivers and Marr acted in reckless disregard of Mr. Latimer's rights.

41.

As a result of the wrongful arrest of Mr. Latimer, he has sustained actual and compensatory damages, and is entitled to recover such damages, in addition to costs and judicial  interest.

## CAUSE OF ACTION: STATE LAW MALICIOUS PROSECUTION

42.

Defendant Rivers actions in commencing a criminal proceeding against Mr.Latimer without probable cause constitutes the tort of malicious prosecution under Louisiana Civil Code Article 2315.

43.

Petitioner specifically alleges that defendant Rivers acted with malice in commencing the criminal proceeding against Mr. Latimer, or, alternatively, defendant Rivers acted in reckless disregard of Ms. Latimer's rights.

44.

As a result of the malicious prosecution of Mr. Latimer,  he has sustained actual and compensatory damages, and is entitled to recover such damages, in addition to costs and judicial interest.

**JURY DEMAND**

45.

Jury trial is demanded.

WHEREFORE, Plaintiff prays that after due proceedings had:

A.    There be judgment awarding plaintiff for his actual and compensatory damages, punitive damages, attorneys' fees, judicial interest and costs; and

B.    For full, general and equitable relief; and

C.    For trial by jury as to all claims herein.


**Law Offices of Bryce J. Denny, LLC**


By:_____*/Bryce J. Denny/*_____
            Bryce J. Denny (Trial Attorney)
            La. Bar Roll No. 22,763
            209 Polk Street
            Mansfield, Louisiana 710526
            (318) 871-5007
            bryce@brycedenny.com

            ATTORNEY FOR BRANDON LATIMER